**COURT OF APPEALS
DECISION
DATED AND FILED**

**April 12, 2023**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2022AP1589**

Cir. Ct. No. **2021GN19**

**STATE OF WISCONSIN**

**IN COURT OF APPEALS
DISTRICT II**

IN THE MATTER OF THE GUARDIANSHIP AND PROTECTIVE PLACEMENT OF L.J.F.G.:

WINNEBAGO COUNTY DEPARTMENT OF HUMAN SERVICES,

   PETITIONER-RESPONDENT,

  V.

L.J.F.G.,

   RESPONDENT-APPELLANT.

APPEAL from an order of the circuit court for Winnebago County: DANIEL J. BISSETT, Judge. *Affirmed and cause remanded with directions*.

¶1 GUNDRUM, P.J.[1] Emily[2] appeals the circuit court's order for the involuntary administration of psychotropic medication pursuant to WIS. STAT. § 55.14. She asserts that at the hearing on Winnebago County Department of Human Services (the County)'s petition seeking the order, the County failed to present sufficient evidence to satisfy the statutory requirements for such an order. For the following reasons, we affirm and remand with directions.

¶2 The County filed a petition seeking an order for the involuntary administration of medication to Emily under WIS. STAT. § 55.14. Following a two-day evidentiary hearing, the circuit court granted the petition and ordered the involuntary administration of medication. The court thereafter granted Emily's request to stay the order pending the outcome of this appeal.

¶3 The parties appear to agree that the sole question we must decide on appeal is whether there was sufficient evidence presented at the hearing to support the court's order for the involuntary administration of medication to Emily. We conclude that the County presented sufficient evidence.

¶4 Whether the County met its burden of proof before the circuit court presents a mixed question of law and fact. *See Waukesha County v. J.W.J.*, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783. "[W]e will uphold a circuit court's findings of fact unless they are clearly erroneous," *Langlade County v. D.J.W.*, 2020 WI 41, ¶24, 391 Wis. 2d 231, 942 N.W.2d 277, and "we accept reasonable inferences from the facts," *Winnebago County v. Christopher S.*, 2016

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2] "Emily" is a pseudonym for L.J.F.G.

2

WI 1, ¶50, 366 Wis. 2d 1, 878 N.W.2d 109 (citation omitted). "[W]hether the facts satisfy the statutory standard," however, is a question of law we review independently. *D.J.W.*, 391 Wis. 2d 231, ¶¶25, 47. On appeal, Emily has the burden to show that the circuit court erred. *See Gaethke v. Pozder*, 2017 WI App 38, ¶36, 376 Wis. 2d 448, 899 N.W.2d 381.

¶5　　Among other things, to receive an order for the involuntary administration of medication under WIS. STAT. § 55.14(3), the County must show by clear and convincing evidence that "[u]nless psychotropic medication is administered involuntarily, the individual will" either "incur a substantial probability of physical harm, impairment, injury, or debilitation" or "present a substantial probability of physical harm to others." Sec. 55.14(3)(e), (8). "The substantial probability of physical harm, impairment, injury, or debilitation" is to be evidenced, as relevant here, by

> [t]he individual's history of at least 2 episodes, one of which has occurred within the previous 24 months, that indicate a pattern of overt activity, attempts, threats to act, or omissions that resulted from the individual's failure to participate in treatment, including psychotropic medication, and that resulted in a finding of probable cause for commitment under [WIS. STAT. §] 51.20(7), a settlement agreement approved by a court under [§] 51.20(8)(bg), or commitment ordered under [§] 51.20(13).

Sec. 55.14(3)(e)1.

¶6　　In the hearing before the circuit court, multiple psychiatrists as well as lay witnesses testified in regard to the danger Emily presents to herself and others if she is not involuntarily medicated. While much of the testimony provided generalities, the County presented sufficient evidence of "2 episodes" that satisfy the above standard.

¶7      Emily's sister testified that in approximately the fall of 2020, while Emily was "off her meds," she became delusional on a Friday afternoon, went missing, and was finally located at an auto dealership the next morning. Emily refused to get out of her car at the dealership, and "[s]he had soiled herself because she had been there all night." Police arrived and for some time, the sister, Emily's husband, and the police were unable to convince Emily to leave the dealership. Eventually, Emily did get into her husband's truck, and the sister's husband drove Emily's car. Instead of going home, they took Emily to the Theda Clark emergency room parking lot and "convinced her she needed to get checked out." The sister testified that they hoped a doctor "would put [Emily] under a 72-hour hold because we were all afraid we couldn't find her and finally found her so we were fearful that she was going to take off again."

¶8      Doctor Marshal Bales, a psychiatrist who had examined Emily numerous times throughout the years and most recently at her group home on January 8, 2022, testified that on that date, he examined her "as best I could because she was so angry and really threatening that I ended." Prior to the examination, Bales had spoken to staff at the group home to discuss "safety in view of [Emily's] tending to rage and scream, which she did." Bales described Emily's condition causing her need for medication as "[s]chizo affective and she has basically a chronic mania with psychosis." He indicated that "on January 8th she was refusing to take medications for a very clear mental illness." He added that "this is well documented by me and countless others, countless times actually that she has a pattern of a very severe and persistent mental illness for which she will not get help voluntarily." He indicated that during his meeting with Emily, he

> abbreviated the interview for safety reasons. She was escalating. She did not sit down the entire time. So right there I felt some fear, although, frankly, I'm experienced at

this, so I kept an eye out for where the door was, where everyone was in the room, and I terminated the interview before anything further happened or yelling or screaming.

¶9    Bales referred to another examination of Emily, on September 26, 2020, in which she "was equally threatening with me and yelling, screaming," and he also had "some fear for my safety." He added that she "really goes ballistic related to her manic, psychotic state." In relation to this examination, he referred to seeing her "at Theda," noting "that she was demonstrating some inability to care for herself" in relation to a September 19, 2020 situation in which Emily "was a missing person and then when they found her she had been off her medicine and had also been unable to care for herself; basic needs, she lost weight, she quit eating, and that was related to the psychotic state."

¶10    Bales stated that "[t]here are many other examples from other years," and specifically referred to an incident in 2013,

when [Emily] was at her home in a manic, psychotic state, and basically she attempted to kill police and the neighbor. She also was aggressive with her husband and nurses. And the police noted at the time the[y] were there she had [been], quote, very close to fighting them regarding the medical staff there.

Bales also referred to "other situations" when he had met with her in 2017 and 2019, but provided no specifics. He added, "every single time I dealt with her she's very verbally abusive, threatening, and I believe it's related to this manic state …. I think it's this mental health condition that makes her so threatening." He stated that it has "been a pattern on all of my five or six examinations … over the years, [that Emily] will not pursue voluntary treatment, will not accept that she has a mental illness and she makes medication the problem when it's actually really helping her condition." He noted that she is "treatable for this."

5

¶11     On cross-examination, Bales stated that when he saw Emily in January 2022, she was not on medication and was "so manic" and "basically … delusional about her psychiatric medication, frankly, like many of the delusions she has had." He opined that "she's either dangerous or endangered," adding "I think she's dangerous, frankly." He also expressed that "it's just not right for people to terrorize neighbors or family or, frankly, treatment givers, police, nurses. All of this she's done over the years at times." "[W]ithout psychotropic medication," he testified, "she will have ongoing manic psychotic symptoms and she will become dangerous or endangered." He added: "The best prediction of future violence is past violence, in general. And this patient has a serious history of threatening behavior when untreated … and that enhances the chances for future dangerousness."

¶12     The County also submitted to the circuit court records showing that a probable cause hearing was held on September 23, 2020, in Winnebago County Circuit Court case No. 2020ME394, after which the court found there was probable cause to believe Emily is, inter alia, "dangerous to self or others" and ordered her detained at "Thedacare Regional Medical Center—Neenah." Then, on October 1, 2020, the court held a hearing, found Emily to be dangerous, and ordered her committed under WIS. STAT. ch. 51. The court subsequently ordered her commitment extended. While we reversed this extension order on appeal, *see Winnebago County v. L.F.G.*, No. 2021AP1063, unpublished op. and order (WI App Sept. 15, 2021), there is no indication—either in that reversal or otherwise— that the September 23, 2020 probable cause finding was legally invalid for any reason. Thus, that probable cause finding satisfies the requirement of a "finding of probable cause for commitment …, a settlement agreement …, or commitment ordered …" for one of the "2 episodes" necessary to evidence "[t]he substantial

probability of physical harm, impairment, injury, or debilitation" under WIS. STAT. § 55.14(3)(e)1.

¶13 Emily asserts the County "has offered no clear and convincing evidence linking any 'episode' of Emily's dangerous behavior to [the 2020 and 2013] orders." We think the link is sufficient. Related to the September 23, 2020 probable cause finding and October 1, 2020 order of commitment, Bales testified to seeing Emily "at Theda," noting "that she was demonstrating some inability to care for herself" in relation to a situation "on September 19 of that year." He explained that Emily "was a missing person and then when they found her she had been off her medicine and had also been unable to care for herself; basic needs, she lost weight, she quit eating, and that was related to the psychotic state." The order finding probable cause indicates Emily would be detained at "Thedacare Regional Medical Center."

¶14 Emily's sister testified that in "approximately the [f]all of 2020," while Emily was "off her meds," she became delusional on a Friday afternoon, was missing all night, and was found to have soiled herself when located the next day. As it turns out, September 19, 2020—the date noted by Bales in connection with his September 26, 2020 engagement with Emily—was a Saturday, which corresponds to Emily having gone missing on a Friday afternoon and being found the next day "unable to care for herself." Furthermore, when Emily was found by her sister and others on that Saturday after she had gone missing, she was taken to Theda Clark. We think the connection is clear that Bales and Emily's sister are referencing the same September 18-19, 2020 episode that led to the September 23, 2020 probable cause hearing and the related finding made by the circuit court.

¶15    Related to the 2013 incident, the County certainly could have done a better job presenting evidence related to this "episode." Nonetheless, Bales testified that Emily was in "a manic, psychotic state, and basically she attempted to kill police and the neighbor. She also was aggressive with her husband and nurses. And the police noted at the time the[y] were there she had [been], quote, very close to fighting them regarding the medical staff there." This testimony is hardly a model of clarity and does not put much meat on the bones. That said, it clearly does refer to a specific 2013 "episode" and contributes to the circuit court's implicit determination that the County sufficiently presented a pattern of concerning conduct by Emily. In addition, Bales and other doctors testified that without medication, Emily becomes delusional and in a manic, psychotic state, which leads to her acting out in dangerous ways. Bales testified that Emily has "a serious history of threatening behavior when untreated … and that enhances the chances for future dangerousness." Additionally, the documentation submitted to the court by the County shows that a hearing was held in May 2013, after which the court found Emily was dangerous and ordered her committed under WIS. STAT. ch. 51. We think the circuit court did not err in drawing the obvious implicit inference that the 2013 episode to which Bales testified led to the 2013 commitment order.

¶16    For the foregoing reasons, we conclude that while the County could have done a better job presenting details at the evidentiary hearing on this matter,[3] the evidence that was presented was nonetheless sufficient to satisfy the statutory standard. We affirm the order of the circuit court. The court's order for the involuntary administration of psychotropic medication under WIS. STAT. § 55.14 will remain stayed until remittitur. The circuit court shall lift the stay of this order within five days of remittitur.

*By the Court.*—Order affirmed and cause remanded with directions.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.

---

[3] This judge, for one, strongly encourages not only this county but other counties as well to take more care in this regard in the future. It is my observation that a significant number of WIS. STAT. chs. 55 and 51 appeals could be avoided entirely if counties would take just a little more time and care to ask a few additional thoughtful questions or otherwise present additional evidence—such as reports, for example—that would help to more clearly satisfy statutory standards. It seems to this judge that the requisite evidence often exists but is simply not presented by the county or not presented in as careful and thoughtful a manner as possible. I do not suggest in any way that the job of the county personnel working on these cases is easy; however, it appears from my singular perspective that much time could be saved for everyone in "the system" if such additional time and care was employed at the petition and hearing stages.